592 A.2d 1210

IN THE MATTER OF ADVISORY COMMITTEE ON
PROFESSIONAL ETHICS OPINION 635.

Argued January 28, 1991—Decided July 25, 1991.

*Kenneth J. Bossong,* Director and Counsel, argued the cause for appellant New Jersey Lawyers' Fund for Client Protection (*Kenneth J. Bossong,* attorney; *Marian B. Copeland,* Deputy Counsel, on the briefs).

*David E. Johnson, Jr.,* Counsel, argued the cause for appellant Office of Attorney Ethics (*David E. Johnson,* attorney; *Richard J. Engelhardt,* Assistant Ethics Counsel, of counsel and on the brief).

*Alexander P. Waugh, Jr.,* Assistant Attorney General, argued the cause for respondent, Advisory Committee on Professional Ethics (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

PER CURIAM.

This appeal challenges the approval by the Advisory Committee on Professional Ethics (ACPE) of the use of an "Authorization to Endorse" form (the form). When executed by the client, the form would authorize the lawyer to endorse the client's name on a draft representing the amount of the settlement in a tort action. The lawyer would then deposit the endorsed draft in his or her trust account before final distribution of the proceeds.

We conclude that except for its application in certain unusual circumstances, the foregoing procedure should not be adopted. We therefore modify the ACPE's Opinion 635.

I

A New Jersey law firm sought from the ACPE an advisory opinion that the firm's use of a form that it had prepared "would conform to our State's ethical requirements." According to the law firm, the form was designed for the convenience of its clients. As explained in the firm's letter of inquiry, "when our clients are in the office signing our detailed release and disbursement statement * * *, they will inquire if there is a method whereby they might avoid the inconvenience of returning to our office an additional time merely to endorse their settlement checks." In addition, "clients are often concerned about conducting such a transaction through the mail due to the necessary time lag and uncertainty of delivery."

To address those concerns, the firm developed a form that when signed by the client would allow the lawyers to endorse and deposit settlement checks into the firm's trust account. Recognizing that the form grants the law firm a power of attorney, the inquirers emphasize that the client would sign the form only after the settlement had been consummated, after the release had been executed, and after the client had signed the closing statement required by *Rule* 1:21–7 or *Rule of Professional Conduct* 1.5c. The former requires that "[u]pon

conclusion of a matter resulting in recovery, the attorney shall prepare and furnish the client with a signed closing statement * * * in the form prescribed by the Administrative Director of the Courts." The latter specifies that at the conclusion of all contingent-fee matters, "the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination." The law firm attached to its letter a copy of its form "Statement of Disbursements of Settlement Funds" as well as a copy of the form that is the subject of its inquiry.

Concluding that this Court's opinion in *In re Conroy,* 56 *N.J.* 279, 266 *A.2d* 279 (1970), was not controlling, the ACPE found nothing improper in the law firm's suggested procedure. The ACPE concluded as follows:

> The requirements with respect to fee arrangements and closing or written statements showing the remittance to the client and the method of its determination make the client aware of the amount of the recovery [that] the client is entitled to receive. If after that has been done, the client for his own convenience executes a written authorization permitting his attorney to endorse the settlement draft or check received in settlement of the matter or in satisfaction of a judgment and to deposit same in the attorney's trust account for the sole purpose of disbursing the funds in accordance with the closing statements, we see nothing improper in such a procedure.

The ACPE distinguished *In re Conroy, supra,* 56 *N.J.* 279, 266 *A.2d* 279, on the basis that Conroy had included in his retainer agreement a provision giving him "full power * * * to execute any draft or check in _____ behalf and to make disbursements of the proceeds covering all medical and hospital bills and to retain ____% of the total recovered if settled and ____% if trial is had." This Court roundly disapproved of the inclusion of such a provision in a retainer agreement, as follows:

> We pause at this point to make clear that we consider employment by members of the bar of the type of retainer and power of attorney described above to be highly improper. The practice of insurance carriers or other settlors in drawing settlement checks in the joint names of the attorney and the claimants is to protect and preserve the interests of all three parties to the

transaction. The form of retainer in question facilitates the subversion of that purpose and is unqualifiedly disapproved. [*Id.* at 282, 266 *A.*2d 279.]

Because the inquiring law firm proposed to use the power of attorney not in its retainer agreement but only "at the request and with the consent of the client *after* settlement had been consummated and after the client signed the closing statement," the ACPE concluded that the dangers that dictated the result in *Conroy* are not present under the proposed arrangement.

We granted petitions for review filed by the Clients' Security Fund of the Bar of New Jersey (now the Lawyers' Fund for Client Protection, hereinafter LFCP) and the Office of Attorney Ethics (OAE), 122 *N.J.* 382, 585 *A.*2d 386 (1990), and stayed the effect of Opinion 635 pending disposition of our review.

## II

In its petition for review the OAE emphasizes the risks that are created when an attorney is allowed to endorse settlement drafts. According to the OAE, Opinion 635 would increase the opportunity for misappropriation of client funds by depriving clients of actual notice of the amount of the settlement and of the time when the funds were received. Even though the client would not give the lawyer endorsement authorization until after the client had signed the release and had been presented with the closing statement, safeguards against the transgressions of an underhanded lawyer would be insufficient because the funds would be entirely within the control of the attorney, who thus would be afforded a greater opportunity secretly to manipulate those funds.

The OAE calls our attention to *In re Zalel,* 118 *N.J.* 420, 572 *A.*2d 189 (1990), in which the Court had the benefit of the Disciplinary Review Board's unpublished Decision and Recommendation for disbarment (the respondent offered his consent to disbarment, which the Court accepted). Zalel was able to withdraw fees prematurely by obtaining his client's authoriza-

tion to endorse settlement checks on the client's behalf. He then used those funds to create a float to conceal the fact that he had already embezzled funds of other clients. To keep the scheme going, Zalel delayed payment to his clients for periods ranging from 58 to 211 days from receipt of the settlement proceeds. *Zalel* illustrates the proposition that even if a lawyer has not gone to the trouble of having the client sign a release for an amount less than that for which the case has been settled (and then obtained a settlement draft for the full amount on the strength of a forged release in the correct amount), the lawyer nevertheless secures the advantage of time before the client begins to suspect that something is amiss.

When the client's signature is required, the client has some control over the process because he or she chooses when to sign the check and knows that the funds should be available several days after deposit. The lawyer, too, has an incentive to notify the client of the actual receipt of the instrument as soon as possible, because the attorney cannot collect the fee until the client has endorsed the settlement draft, the lawyer has deposited the funds into the attorney trust account, and the funds have cleared for disbursement.

Finally, the OAE argues that the proposal is unworkable in application. Even though Opinion 635 limits the use of the form to the situation in which the client requests that it be used, the reality of the situation (as acknowledged by the ACPE at oral argument before this Court) is that in most situations the process would start with the advice of the attorney who, if bent on skullduggery, would unlikely give adequate warning of the possible dangers. In sum, the OAE contends that the risks far outweigh the benefits of client convenience.

For its part the LFCP reminds us that in the situation in which the dishonest lawyer forges a client's endorsement on a settlement draft and skips town with the proceeds, the victimized client may still gain the advantage of the Uniform Commercial Code (Code) provisions on forged endorsements, which

would permit the client to look to the payee bank for payment of a check or draft that is not "otherwise properly payable" under section 4–401 (*N.J.S.A.* 12A:4–401) and for conversion under section 3–419 (*N.J.S.A.* 12A:3–419). In that situation, the depository bank generally suffers liability under section 4–207 (*N.J.S.A.* 12A:4–207). See, *e.g., Palomo v. State Bar,* 36 *Cal.*3d 785, 795, 685 *P.*2d 1185, 1190, 205 *Cal.Rptr.* 834, 839 (1984); *Florida Bar v. Allstate Insurance Co.,* 391 *So.*2d 238 (Fla.App. 1980); *Clarkson v. Selected Risks Insurance Co.,* 170 *N.J.Super.* 373, 406 *A.*2d 494 (Law Div.1979); *Morris v. Ohio Casualty Insurance Co.,* 35 *Ohio St.*3d 45, 517 *N.E.*2d 904 (1989); *State v. Musselman,* 667 *P.*2d 1061 (Utah 1983). According to the LFCP the client would lose that Code protection were we to authorize the form, because the attorney intent on misappropriation would be able to complete his or her scheme without the necessity of forging the client's signature—that is, once the lawyer convinces the client to consent to the use of the form, the lawyer can sign the client's name, and the issuer of the draft and the bank will not suffer any liability. Were that to occur, the LFCP would lose a significant source of recovery of misappropriated funds. As does the OAE, the LFCP argues that although lawyers who misappropriate their clients' money are few in number, there is not enough gained by way of client convenience to justify the increase in risk that would result from implementing Opinion 635.

In support of its opinion the ACPE acknowledges the force of *Conroy* and disavows any intent to make inroads into that opinion's disapproval of a retainer agreement that embodies the sort of power of attorney included in the inquirer's form. Rather, the ACPE concludes that the procedures surrounding the use of the inquirer's form so reduce the risks posed by the *Conroy* form as to render the former acceptable. The safeguards that persuade the ACPE are found in the circumstances that the form would be used only after the case had been settled, only after the client had signed the closing statement and release disclosing the settlement amount, and only on the

client's request (although, as indicated above, the ACPE acknowledges the likelihood of the lawyer informing the client of the opportunity to avoid another trip to the lawyer's office). The ACPE concludes that on balance clients whose convenience would be served by having their attorney endorse a settlement draft on their behalf should not be denied that additional convenience simply because a few rascals, who are not going to be deterred from their evil deeds anyway, might abuse the use of the form.

### III

In severely limiting the circumstances under which the procedure sanctioned by Opinion 635 may be acceptable, we hasten to reaffirm our confidence in the integrity of the bar in general. Only a very small number of lawyers would be tempted to take advantage of the opportunity for fraud that the procedure envisioned by the use of the form creates. Small as that number may be, we conclude that as a matter of policy, in the discharge of our obligation to superintend the practice of law in this state, we should discourage that opportunity. We do not perceive the advantage gained in client convenience as sufficient to outweigh the increased risk for the unscrupulous lawyer to victimize his or her clients.

We should make clear exactly what it is that we are disapproving: the routine use of a form that extends power of attorney to the lawyer in endorsing the client's name to a settlement draft. We will not permit the form to become a part of the package of a lawyer's ordinary closing papers. We acknowledge that there may be extraordinary circumstances—the client on the eve of departure for an extended stay in a foreign land, a client about to undergo surgery, with a doubtful prognosis and an extended hospital stay to follow—that might justify use of such a power of attorney. Those, however, are not the situations contemplated by the inquiry nor does Opinion 635 purport to be so limited.

The parties have called to our attention a regulation of the New York Insurance Department, *N.Y.Comp.Codes R. & Regs.* tit. xi, § 216.9 (1988), that requires insurers to notify the client-payee of the check, including the amount when it is in excess of $5,000, at the same time that the check is mailed to the attorney. The advantage is obvious: an attorney cannot successfully misrepresent whether a check has been issued nor the amount of that check. The experience in New York, which allows personal-injury clients to endorse settlement checks, see, *e.g., Hutzler v. Hertz Corp.,* 39 *N.Y.*2d 209, 347 *N.E.*2d 627, 383 *N.Y.S.*2d 266 (1976); *In re Miller,* 90 *A.D.*2d 618, 454 *N.Y.S.*2d 913 (1982), has been favorable. Claims against New York's counterpart to our LFCP have dropped since the effective date of the regulation. See 202 *N.Y.L.J.* 1 (1989).

Were such a regulation in effect in New Jersey, our response to the procedure contemplated by Opinion 635 might well be different, inasmuch as the risks implicit in the use of the inquirer's form would be substantially reduced. We respectfully commend to the Commissioner of Insurance his consideration of a regulation similar to New York's.

### IV

Opinion 635 is hereby modified in accordance with this opinion.

*For modification* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed* —None.